2015, 5-0-2-8. Mr. Hill, when you are ready. May it please the court and counsel. The trial court in this case ended her decision below with the following language. The BLM has clearly decided to prioritize the recovery of Trona over the recovery of oil and gas in the MMTA. Under the law, as we'll discuss today, this finding should have led to a determination in favor of the appellant or the plaintiff's below. I'll break my argument today in two sections. The first section deals with breach of contract or the contract claims, the repudiation, and the second part will deal with the taking aspect, which leads us to a discussion of ripeness. Why don't you just file an application for drilling with the BLM? I mean, you say you think it would be futile, but what would have been the harm in going through that exercise? Because that would have helped you a lot, both with respect to ripeness and repudiation, would it not? Taking the case back in history, Your Honor, in 1992, that's exactly what led to the controversy. The industry at that time filed a unit application with the BLM and an APD was filed. That led to an uproar on the part of the Trona industry who came in to BLM. This is all reflected in the record, of course. The uproar by the Trona industry led BLM... Right, but when you say that the industry filed an application, you didn't file an application. Our predecessors did, and predecessors in interest. So that led to the Joint Industry Committee, which BLM was a part of. My client attends no fewer than 45 meetings of that committee, which ultimately in the year 2000 stated that they didn't think that concurrent oil and gas development should go forward. The BLM decides at that point, remember that the, and I'll take you one step back further in history, that the 1986 RMP indicated that there was no restriction on oil and gas drilling in the area, contained no restrictions that are pertinent. So in the year 2014, or 2004... Isn't your basic point that indefinite suspensions renewed and continued over a couple of decades basically amounts to a breach? Absolutely, Your Honor. I think that's clear from the Mobil oil case, which was preceded by the Conoco case. Well, Mobil dealt with a statutory situation, didn't it? It did. It did. The Outer Banks Protection Act. And the government's argument in this case is that unless it is congressionally mandated, that the edict comes from Congress, that the case doesn't apply. I would say it does. But I take it that at least during the period of suspension, there had been some drilling permits that had been issued, the SORUS permits. SORUS permits preceded the final EIS by several years. Right, but there was still, there was a period of suspension. The suspension was on during that period, right? So there was nothing inconsistent between the suspension and actually granting the drilling permits, right? Nothing inconsistent. I would argue with that in the sense that the inconsistency comes through the final EIS. And the final EIS, which the trial court did not address, says that oil and gas drilling shall be prohibited until all terminal mining is completed. As you know very well, the BLM is statutorily required to go through the EIS process. That language can't be superfluous, can't be meaningless. They must mean what they say by that. What about the fact that the BLM said that it understood that it had to honor valid pre-existing rights? Your Honor, it was boilerplate language. That language, which I've just cited to you, Section 4.2.2.2, is the more specific application of the EIS to this case. No. I'm sorry. I'm sorry, go ahead. Well, they specifically addressed the issue through that language. The language that Judge O'Malley is talking about is generalized language. And as between the general and the specific, certainly the specific takes hold. But I guess you could have made it specific by applying, filing an application, having it be denied, and then you say, well, you're not honoring valid existing rights. Your Honor, we went through this process throughout. We understood what the statements were of the BLM from 2004 on, which are highly, in a highly detailed way, set forth in our briefing. We were participants in that process. BLM was saying, while we have not made a decision, it is our view that oil and gas should be prohibited. Then you have the 2008 final EIS, which firms that language. And so we're operating under that regimen. And that regimen says no oil and gas is compatible with TRONA area-wide. It's an area-wide determination. And it's one that the BLM is bound to implement. Are all the leases that issue here, the 26, they're all in the MMTA, right? They are. But the... I need to correct that, if you don't mind. Interestingly, at the time of trial, two leases, I'm indicating in the courtroom at trial, the BLM says, oops, two of those leases fall outside of the MMTA. We're pulling them out. Pulling them out? What do you mean by pulling them out? Well, drop the suspension. Okay. So you're down to 24? Well, we contend we're still at 26, because the prohibition still applied through those years to the 26. Well, but, I mean, surely you could go back to them with respect to those two and say, okay, pony up. You said you were taking it off the suspension. We want to drill. And then they give you a permit or they don't. Well, and as it works out, the time left on those leases were so short that they expired. But they were suspended, so the time wasn't running during the period of suspension, right? No, but understand that when the suspension is lifted, you have only that amount of time that's left on the lease. So you're... No, no, no. I thought that wasn't true. I thought the suspension said that during the period of suspensions, the leases can't expire. Are you saying that they can keep running, they just can't expire? I thought they were all held in abeyance. That was my impression, too. Right, right. Let me back up and try to make this a bit better. Once the suspension is lifted, you are then left with the remaining primary term. So, for example, if the suspension... So you go back to where you were in terms of time left at the moment that the suspension was implemented, right? Right, right. And so those leases expired. That's the long short of the discussion. Okay. I'm so confused, but... Well, let me give you an example. Let's say that the suspension was implemented, if it's a 10-year lease, it was implemented at the 9-year, 6-month mark. Okay, when the suspension is lifted, you have 6 months to utilize that lease. Okay. So that, to the extent that there was any taking, to the extent you could argue there was a taking by the improper suspension, it wasn't much of a taking. Well... I mean, did you ask the district court to separate out those two leases at that point and say that as to those, because the suspension had been by mistake, that there should have been a separate independent taking claim as to those? We did not. We treated them as part of our overall plan. So, as to the repudiation, we believe... But let me go back to my question that got you off on that track. Is there any ability, have you ever asked the BLM to allow you to lease somewhere outside the MMTA and elsewhere in the KSLA? Or is there nothing valuable? And I'm going to need to understand your question a little better. I hear you saying, have we asked for a lease trade? Right. Right. These were all options that were discussed, and the trial record is replete with these references, that there were many options discussed along the way. Recommendations by BLM personnel that the leases be brought back. Recommendations. Recommendations that they be traded. And the BLM never saw fit to move forward with those recommendations. They, in fact, took the route that required only intra-agency review, which was to maintain the lease suspensions. Did you want to address takings? If I might, Your Honor, I'd like to just kind of summarize the remaining points on repudiation, which is we believe that there's no authority for the long-term suspensions under the congressional limited delegation authority for limited suspension powers that comes under Conoco. We think that the mobile oil case talks about the fact that it would be an illusory bargain if you were to allow for unilateral right of control over the leases. And we've discussed the repudiation aspects in terms of the final EIS. And then I would just add, to finish this discussion out, that there was a new condition added, which was you're going to have to protect the Trona miners in order to use these leases. Never a basis of the bargain. Never something that was envisioned. This was something wholly new. Of course, these leases are all conditioned upon observance of regulations relating to safety and health, including subsequent regulations. And there are all sorts of hedges in these leases. The hedges apply to drilling in a safe manner, ensuring that nobody on the surface or in the drilling operations is injured. Safe drilling operations doesn't extend, never has, to a separate industry where you're required to protect a separate industry. Well, separate industries. The regulations we're talking about here, I think are 43 CFR 3162, you're familiar with it, 1 and 5, that talk about protection and safety of property and persons. I mean, suppose that you had a drilling technique that you wanted to use, let's just say fracking for lack of a better term, of a type that would have polluted the groundwater in the entire area. You think that that would be not prohibitable by the BLM under the regulations? I think it would be. It would be prohibitable. That's an environmental concern. And then something that had such powerful effects that it would have an effect on the nearby town, like rock springs, and undermine houses and buildings, that would surely be prohibitable, right? I don't think so. I think that the agency needs... I think that Congress has provided for the situation through the multiple mineral development mandate, the statute we decided to make, which is to say these multiple mineral conflicts are dealt with by the multiple mineral conflict language in the leases, where the BLM and its multiple mineral mandate lays out a procedure where both mineral states will be utilized. One will not be used or the other for decades, long beyond my client being on the earth. And so Congress has provided for this. And that approach was not taken here. Remember that the BLM studied this area before the 1986 RMP was issued. It found that the area was both eligible and available, which is a determination that went into issuing the leases. Mr. Healy, your time is almost up. We'll give you two minutes for rebuttal. Thank you, Your Honor. Ms. Kranz. Thank you. May it please the Court, Erica Kranz for the United States and with me, Ms. Brink-Sanger. What is the likelihood that any application to drill for oil and gas in the MMTA would ever be granted? Well, it's highly site-specific. For one thing, the APDs that were previously granted in the MMTA while the leases were suspended shows that it can be done. So those were for surface mining, though, weren't they? That's a dramatically different thing. For shallow drilling above the level of a terminal mine. If you take a look at the map that's in the supplemental appendix at 81, you can see that plaintiff's leases are scattered across a very wide area. So consideration of a particular APD is going to be highly site-specific. It's going to depend on where they want to drill, what methods they want to use. But with the environmental impact statement saying there should never be any drilling at all in the entire area, how do you ever get to the point where you could approve anything site-specific or not? What the environmental impact statement was doing was explaining the status quo and that there's been a conflict that's recognized. BLM has attempted to develop an area-wide process and rules for allowing drilling, and now we're in the RMP revision process and we're going to decide what to do. What the actual decision was coming out of that was to allow the suspensions to remain in place, recognizing that BLM couldn't alter the existing leases, that those leases continue to have full legal effect, that it can hear requests to develop, and then it can impose conditions on approved requests to develop, just like it always can under the regulations and under the lease terms. Plaintiff has suggested that these leases were essentially without condition or without restriction, but the leases themselves contain language requiring operators to protect other resources. But if a condition is that you can't mine while there's Toronto mining going on, and Toronto mining is going to go on for 2,000 years, then how is that not an additional condition to the lease that is inconsistent with the fact that the leases were granted in the first place? There's nothing new about Toronto mining or about the requirement that drilling be conducted safely. That's always been a condition of these leases, both in the lease language and through the regulations that are incorporated into those leases. We think BLM has imposed no new conditions here simply by requiring plaintiffs to go through the ordinary process that's been in place the entire time that these leases have been effective, whereby plaintiffs have to file a site-specific request to develop and allow BLM to consider an actual development request. I found the map a little hard to interpret. For one thing, the printing wasn't so great, but I did get the idea that the leases were kind of spread out over the area. What I didn't see, and perhaps it wasn't indicated there, was where the Toronto mines are. That's right. Now, can you enlighten us on that? Are the Toronto mines throughout that area, or are they concentrated in a particular area? I don't believe they're throughout their area. Do we have some kind of evidence that we can look to, rather than taking your supposition? I can look in the record and point you to something additional, perhaps in a 28J letter, but I don't have something else to point you to at this moment. I guess where I'm going, obviously, is are we talking about some of the leases being sufficiently far away from Toronto mines, so that even though, as a general matter, the EIS may say we don't want mining to conflict with the drilling, nonetheless, there would be no significant or even plausible argument that there's a conflict with respect to some of the leases. Is that the state of play? Well, there was testimony at trial that, at the very least, some of the leases that are in the fringe areas along the edge of the MMTA should, in theory, be developable. We talked earlier about how there were two leases that were found to be outside the MMTA, and the suspension was terminated. Earlier in this case, there were six additional leases that were found to be outside the MMTA, the suspension was terminated, and the leases have since expired. But the other 24 are in the MMTA? They are either fully in the MMTA, or there are quite a few of them that straddle the border, and you can see that on the... The final resource management plan says we're not going to grant it. I mean, they can apply, but it says right there that they're not going to be granted. Well, I think it's an important distinction to make is that language you just quoted is talking about new fluid leasing, and indeed, through the resource management plan revision process, ELM decided that it would not issue any new leases. So you're talking about new leases versus drilling on... So you'll allow them to drill in a way that puts the Toronto miners at risk? No, but if plaintiff can submit an application and show that its proposed activities will not put the Toronto miners at risk, then that should be approved with conditions. Why didn't ELM just buy out these leases or swap them out for someplace else in the area? I'm not certain of why they made that policy decision. I suppose they felt that they were able to adequately protect the other resources and safety in the environment using the existing procedures that are defined by the leases and by the regulations in them. Was it your understanding that Atlantic Richfield was a predecessor in interest to the plaintiffs? I believe at least some of plaintiff's leases were subject to the original suspension in 1992, I believe. It was not my understanding that the APDs filed by ARCO in the 90s applied to these leases. My understanding was that the plaintiffs had ownership of the leases at one point, they sold them, and then they reacquired them in the 2000s, right? That's correct. Plaintiffs reacquired most of these leases in the five years before they filed their claim, after the suspension was in place. Does that matter for purposes of either the contractor taking claims, the fact that they reacquired them during the pendency of the suspension? I'm not sure that it's legally determinative. I think it's interesting context for plaintiff's claims. If plaintiffs believed that the suspensions meant they were never going to be able to develop it, it's curious that they were reacquiring the leases. Maybe they were buying a cause of action. That's possible. Okay. Much of what we've been talking about goes to the repudiation claims, and I want to remind you about the standard for repudiation. It's quite high. This court has, at times, enunciated in two different ways, either a distinct and unqualified intent to not perform, or in another case, positive, definite, unconditional, and unequivocal manifestation of an intent to breach a contract. I think, at the worst, what we have here is some ambiguity about how drilling applications are going to be treated. We don't have BLM saying, we're never going to be able to approve an APB. That's really what distinguishes this case from mobile oil and amber resources, is that in those cases, the agency had no discretion. It was barred from even considering requests. Here, the agency hasn't been barred. The factual situation is difficult, but the agency still can entertain an application. What relevance does Whitney Benefits have here? Whitney Benefits, I think, is distinguishable. I recall we addressed it in our responding brief. This is one of the cases that a plaintiff has cited, arguing that they have a takings claim in this case. We responded saying that Sun Oil is quite clear that where rights are created through contracts, and where the government acts within the framework of that contract, the only remedy can be in the field of contract. We think Sun Oil and Hughes Communications Galaxy clearly say that a takings claim is simply inappropriate here. Whitney Benefits was similar to mobile oil in that there was a later enactment of a statute that, as a legal matter, prohibited coal mining under a federal lease. You're saying here there was a prior enactment? Here, there's been no action that has legally barred the agency from fulfilling its duties. Its duties under the lease aren't to approve drilling requests in every case. It's to consider drilling requests and apply the terms of the lease and the regulations incorporated into the lease. We've talked a little about why the geographic uniqueness of the individual leases requires this site-specific review. The Supreme Court precedent on takings law also explains that you always have to give the agency the opportunity to make a site-specific determination. In the takings context, that's important because we simply don't know whether and to what extent there has been a restriction until we have a site-specific determination. The Supreme Court has said this over and over again in Palo Dolo, Williamson County, McDonald. This court in Boise Cascade says the rule that a taking does not ripen until a permit is applied for and denied has been consistently followed. For all these reasons, we believe that the United States has not repudiated plaintiff's leases. Plaintiffs have not shown that this action meets those high standards for repudiation. The government has not imposed new conditions on plaintiff's leases. It's simply asking plaintiffs to comply with those leases by submitting a drilling application. And plaintiff has never ripened a taking claim for the same reason. If the court has no further questions, I will ask you to affirm. Thank you, Ms. Prance. Mr. Hill has two minutes for rebuttal. Your Honor, the danger of allowing a unilateral right of suspension is that that unilateral right by the agency would, which by the way doesn't include the court. Do you mean unilateral or indefinite? What did I? I didn't hear you. You said, do you mean unilateral, as you stated, or indefinite? It's unilateral in the sense that the agency takes on that power. But that was within the scope of the lease. You understood that. Not an indefinite suspension. We never had that understanding. Right, so that's exactly Judge Lurie's question. And if I didn't detect the question correctly, I apologize. But no, we never anticipated that any more than the court in Conoco or Mobile Oil. Is there a lot of time left on all of these leases or many of them? There's various times. Okay, when you say various times, so did any of the leases run for quite a while before the suspensions were put in place? Some of them did. So why were there no applications during those early periods of time if these were such valuable leases? Well, and that goes back to the way the industry develops leases. I mean, there's quite a few steps that goes into developing a lease. And before suspensions were put in place, the holders of the leases were forming a unit, trying to get the BLM to approve a unit, putting an APD in place. And so all these steps are contained within the running of that initial term on the lease. So this case is not one where the agency hasn't had an opportunity to study the issue, examine what the decision should be. It's examined. It put it into its statutory prescribed process, and it made a very clear decision that oil and gas drilling was to be barred. Thank you very much. Thank you. Thank you, Mr. Hill. We'll take the case under advisement.